Is the appellant ready to proceed? Yes, your honor. All right, you may. Senator Barry Pollack on behalf of appellant Mark Jordan. As the court is aware, the government concedes the district court committed error under Hamilton when instructing on the 666 charge, but contends that the error was beyond reasonable doubt. And as the Supreme Court said in Nader, an otherwise valid conviction should not be set aside unless the reviewing court may confidently say on the whole record that the constitutional was error, was beyond, was not error, beyond a reasonable doubt. And as this court recognized in United States v. Stanford, 823, Fed Third, 814, it is one thing for the government to look back now that the court has provided the proper framework and pick out evidence that fits into that framework. It is another to assume that the jury focused on the same evidence without the benefit of that framework. The government relies heavily on the claim that Laura Jordan changed her campaign position when she voted in favor of the Palisades rezoning. The government argues that Laura's change in position, coupled with the benefits that Mark Jordan provided her, necessarily leads to the conclusion that they had a quid pro quo agreement that she would change her position in return for the benefits. In fact, the government itself characterizes the quo is that in exchange, Laura Jordan, quote, switched her position on the construction of new apartments near neighborhoods. And that's from the government's brief at 46. The natural import of the government's argument is that if the jury believed or would have believed, if given the correct framework, that Laura Jordan's zoning votes were consistent with her campaign position, and that she would  provide her benefits, then the jury could rationally have concluded that Mark Jordan did not intend to influence her official acts, but merely intended to provide gratuities to show appreciation for her votes. And there is ample evidence from which the jury could have rationally concluded that Laura Jordan did not change her position, and that her official acts were entirely consistent with the positions that she took during and even before her mayoral campaign. The government contends that Laura Jordan campaigned against apartments near residential neighborhoods under any circumstances. But the record contains evidence undermining that argument and demonstrating that Laura's position was more nuanced. She was generally opposed to apartments near existing neighborhoods. She only supported apartments near neighborhoods if the development was in a transit corridor and was done so that there would be a buffer between the new development and existing residential neighborhoods. Or as she put it, she was only in favor of development if it was quote, done right. In the fall of 2012, before Laura Jordan ever met Mark Jordan, and before she ran for mayor when she was on the city council, she attended a series of public meetings about the Palisades development, where stakeholders got together to discuss the development. Architect Robert Larry Good attended these meetings. He testified at trial that Laura Jordan, again, before she was running for mayor, before she had announced, before she had met Mark Jordan, was in favor of the Palisades project. His testimony set the record on appeal at 13737-38. He said, quote, she knew a lot about transit-oriented development. I think she was very familiar with the comprehensive plan. She was supportive. She really wanted to see the right thing happen at Palisades. So from the time I first met her, she was an advocate. Defendants Joint Exhibit 19, a record on appeal at 18654, is a memo from Rodman Jordan, Mark Jordan's brother, to Mark Jordan. And he says, quote, I met with Laura Maxa, who actively supported our project during the stakeholder meetings. After these meetings, Laura Jordan announced her run for mayor. And during her campaign, she continued to voice support for development if it was done right. Government witness Michelle Alton testified that Laura Jordan spoke at a public event during the mayoral campaign, a Tea Party candidate forum, and said at this forum, quote, we need more multifamily options, meaning apartments. Joint Exhibit, Defendants Exhibit 176 is the Dallas Morning News Voter Guide, and 177 is the League of Women Voters Voting Guide. In both, Laura Jordan is quoted as saying, we must carefully develop the remaining green space. And the Dallas Morning News Voter Guide, Laura Jordan is quoted as saying, I will see myself as a developer. I will act as a facilitator of smart development, not an obstacle to it. And as her campaign literature said, and this is Joint Defense Exhibit I'm trying to follow, well, I guess I'm trying to discern where you're trying to take me. Are you offering up that it's impossible to bribe a politician if the politician was going to vote for something in the first place? It is not impossible, but it is certainly relevant to whether or not Mr. Jordan intended to buy influence, whether he was intending to exchange his influence to get her to take an official action. How is her view about it relevant to his intent to buy influence? Couldn't he intend to buy influence without knowing what her view is? He could, but here he did know her view. And so surely... And what did he know her view to be? Everything that I just said was said publicly. Mr. Jordan was at these... So all these people who thought part of her campaign was that she was opposed to the development of apartments in these areas, those people are wrong. She was never opposed to it. And she never said she was. Some constituents latched onto particular statements and came to that conclusion. There were plenty of public statements from which a different conclusion could be brought. And here again, the government has to prove beyond a reasonable doubt that a properly instructed jury would not have decided that this was a gratuity. If she was going to vote for this anyway, and Mr. Jordan believed she was going to vote for this anyway, she had been a public advocate for it. It was done precisely the way she said it would be done. She said only in transit corridors. This development is right off of I-75. And she said herself at the first City Council meeting where the vote was taking place, you can't find a more transit corridor than I-75. She also said, I'm only in favor of it if there's a buffer. If the existing homes are not up against the apartments. There was a significant buffer here. There was green space. There was new single-family homes. There were apartments, and the apartments did not even face the existing family. This was development done right. So if there is evidence from the record from which the jury could rationally conclude that, it could rationally conclude that Mr. Jordan believed she was a supporter all along, and therefore he wouldn't be trying to influence her vote. He's expecting her to vote for him. The only thing he could possibly be doing by giving her benefits, to the extent that there was corrupt intent at all, is giving her benefit in reward for that. As the Supreme Court said in some diamond, that's exactly what a gratuity is. A reward for some future act that the public official will take and may have already determined to take, or for a past act. And so if he's not trying to change her vote, not trying to influence her vote, but simply rewarding her for her vote, it's a gratuity. And there's certainly evidence from which the jury could have concluded that. Thank you, Your Honor. May it please the Court, I'm David Gerger for Laura Jordan. In Hamilton, the Court said 666 requires a quid pro quo. The district judge here said it did not, to the jury. And so the district court's instructions would allow a conviction on something that is not a violation.   And the kind of review in this Court is the opposite of what we usually have in a criminal case. Normally, in a sufficiency case, the government presents evidence, the defense might have counter evidence, but as long as the government has evidence there was an instruction that said it is a crime under 666 to influence a vote or reward a vote, and that's exactly the instruction that this Court said was improper in Hamilton. It has to be an influence quid pro quo. And because a reward after the fact does not violate 666, Hamilton was reversed and let's talk about this case. The government here argued to the jury, and this is at page 14478 and 14553 to 67 and 10647. Bribery isn't just money in exchange for doing something, it's a reward given after the act. That was the government's argument at trial. That's what Hamilton forbids. And so the standard is the reverse from a sufficiency case. The standard now is if Laura Jordan presented evidence even if the government had counter evidence that the jury could credit, there has to be a reversal. And every point in the government's brief obviously heard all of that evidence and he concluded, I guess, Judge Mazant, that it's beyond a reasonable doubt did not matter. The case is in a very unusual posture for a criminal case, yes. And I don't understand what you're saying, but the judge, our trial judge sat through that and really said that doesn't matter for a reasonable doubt. Where did he go wrong? He went wrong because he was right in granting an appeal bond by saying it's a substantial question, but he went wrong on harmlessness, and here's why. Every point that the government presents, there's a counter in the evidence. Laura Jordan's testimony by itself could be credited by the jury with a proper instruction to find there was no quid pro quo. She testified for over a day. The government says she didn't want apartments. She explained she did in the right circumstances. They say she hid her affair because she's guilty. She explained she hid her affair because she was embarrassed for her children's sake, and on and on. We're not here arguing whether there was sufficient evidence of guilt. We're here arguing that the testimony presented by the defense, if credited by the jury, would support a reward after the fact and not a quid pro quo. In fact, it's important that all of the monetary benefits were given once the votes were finished. And so the government says ah, but there was sex. Well, it wasn't sex in the sense of Judge Higginbotham's opinion in Barassas where a judge says I'll let the defendant go if she arranges sex for me. This is a romance, an affair. The government says it was insincere. She says it was sincere. So the fact of her testimony alone and the other evidence about the timing of economic benefits could be credited by the jury to make it a reward and not something given in advance to get her vote. I want to touch on the tax counts as well because the same error infects the tax counts. Mark gave Laura money  You're not denying that they met before she ever voted on anything in connection with this project. They met and in between the first and the fourth vote they started their affair. No money came to her until after the fourth vote, after the final votes were all done. That's when he gave her money and she explained what she thought that was for because they were having an affair. He spent money on her. Well, I would say that's disputed. The government says for example that he paid for her ski trip. She explained through her own records that she paid for a flight, she rented a hotel room, she bought her own ski pass, and then she goes and spends the night in his room. He remodeled her house. After the fourth vote, he did, at a cost of $24,000. And when his wife asked him about it, didn't he say, well we owe her that she's made us a lot of money. He did. So he admitted that she made him a lot of money. Yes. By voting in favor of his project. Right. And when you hear Laura's testimony that is not inconsistent with being a fact. And a reward after the fact is not a gratuity. Throughout this trial though, the government, the witnesses, the talk was about quid pro quo. There was talk of quid pro quo. And the upshot of Hamilton was in that one, there was nothing, he didn't receive anything for what he did. That's what Hamilton turned on. You agree? I believe I know the sentence you might be referring to, but actually the trial record in Hamilton, the government argued, and on appeal in this court in Hamilton, the government argued, Hamilton was all about bribery quid pro quo. Cash, money to the council members. So the argument that Hamilton made in the Fifth Circuit was that was just a bribe case, not a gratuity case.  I believe that given the way the government argued Hamilton, the fair reading of that statement is this. That the statute that Hamilton was tried under allowed a conviction for a reward or a gratuity. 666. But 666 should not allow a conviction for a reward or a gratuity. So we're going to reverse Hamilton. And the sentence in Hamilton that says it's a gratuity case comes right after a cite to an honest services case where the case had to have a quid pro quo. And of course, she was acquitted here, Laura, of the honest services counts, which is more evidence that the error was not harmless. Thank you, Mr. Girt. Thank you. Mr. Wisocki. Good afternoon, Your Honors. May it please the Court, Council. I'd like to start just responding to a couple of factual points from Council for Mark Jordan made. One was Laura's position on building apartments near neighborhoods during the campaign and if there was any written position or if she had taken a hard line on that. And that was the central issue in the mayoral campaign was the building of new apartments near neighborhoods. I mean, she had campaign signs with her picture on it saying no new apartments near our neighborhoods, period. And she happened to live in the very neighborhood next to the Palisades development with her then husband, so her position was very clear. As for the argument that they're talking about meeting with the architect and some of Mark Jordan's team in the fall of 2012 before the mayoral election in May 2013 and before the Palisades first vote in December 2013, so that the previous fall that she said that met with the architect and favored Palisades development. That doesn't mean anything. A lot of people favored developing the Palisades. It was just a big strip of vacant land and two towers. The issue was the apartments. And Mr. Pollack said, well, she supported apartments near the Palisades if there was a buffer. And what that meant was a row of single family homes between the neighborhood that was right next to the homes there, she would be in favor of it. And she testified at the trial that, one, she testified at the trial. She supported apartments on the Palisades land before she even met Mark Jordan. So in the fall of 2012 she supported it. But then she testified that it was only because of the buffering that she came around and finally supported it. But the buffering didn't come into play. As she testified, we think this is wrong and false testimony, but she says the buffering only came into play only at my lead, leading up to the first vote in December 2019. Same thing with the concept of phasing. And the concept of phasing was the concern among the residents was you're going to build the apartments first and make the money off the apartments. That's the money maker. And you're never going to get all the cool stuff, the retail, the stuff that makes it happen. Her testimony was, and this is at 1-4-109-10, as I was going into the December 9, 2013 hearing, she was really concerned that the apartments would be built first. So that's where the concept of phasing came into play. And so she testified that she basically insisted on phasing and that's why she's going to support it. But she also testified, I supported apartments all along before I even met Mark Jordan. It just didn't make any sense. In terms of the posture of the case, what makes this case different from Hamilton is the district court, of course we didn't have Hamilton before the second trial. We wish we did. We didn't. There were various post-verdict motions pending for a significant period of time. And then in Hamilton, the panel had granted Hamilton's motion for release on bond pending the appeal. And in that order, Judge Elrod identified the question of whether 666 includes gratuities or not. The writing was on the wall. We thought that Hamilton was going to become law. And Judge Mazant, when ruling on the post-judgment motions in our case and the Jordans had also filed a motion to stay ruling on those motions until the opinion in Hamilton came out. Why didn't you take on that burden and fade the risk? Why didn't you take on the burden? Why didn't the government take on the full burden instead of waiting on Hamilton? Wait until Hamilton comes back. In other words, avoid the risk you got yourself into. Take on the full burden of I'm sorry, I'm just not understanding the question, Your Honor. Well, what was the government's position in their argument in Hamilton? Well, when the motion to stay was filed in our case, our response was Hamilton isn't going to matter because the case was tried as a bribery case. And we had a long listing of... Before you went to trial. That issue was out there. Oh, I see what you mean, Your Honor. Of course, Hamilton wasn't out there yet. There was one circuit, Fernandez, I think 2013-2014, that had found that 666 doesn't embrace gratuities. And our position was consistent with the majority of the circuits as the full court when being pulled on Hamilton recently said... It was a risk that you took. That issue was out there. And I understand why you might want to do that. But anyway... No, I understand, Your Honor. At the time, we thought it was a low risk. And we honestly didn't think about it too much. And we really came to realize how focused the second trial was focused on bribery when the issue of Hamilton came up. And just for the record, at pages 6302-05 and 5706-5709 is where we identified all of the comments that were made that referred to it as a quid pro quo bribery case. And the defense agreed. So this is from the defense's closing arguments. He said, from the very beginning of this case, in Vore Dyer, the prosecutor told you guys that a quid pro quo is required. The prosecutor said that. And we agree. We agree. What you need is a change of a thing of value for a vote. And he said, that's what's required. And so the parties... When it came time for the charge conference, you didn't ask the judge to put that burden, to give you that burden. No, we didn't voluntarily say that you need to include the specific words a quid pro quo is required, but it still included... The thing with the charge, I mean, it tracked the language of the statute. The charge did not require that, the jury, to make that, to reach that conclusion. My only suggestion was with a quid pro quo, I don't think... It's just a question of without to me, admittedly in retrospect, a high risk. I would think you would want to... And given the record that you have in fact here, that you wouldn't take this forward. But you didn't. Yeah, I mean... I don't know that that takes us anywhere. Right. I mean, just reading the language of 666, I mean, a jury reading that language wouldn't necessarily think that gratuity is required given the way that the case was tried and the focus was on quid pro quo bribery. I mean, gratuity is kind of an arcane concept in any case. Bribery, people understand that. And I think that the parties made that clear throughout. And Judge Mazzant never flinched on that. We knew the writing on them all with Hamilton. In denying their motion to stay, pinning Hamilton, he said, it doesn't matter. I've never conceived of this. And he said this at sentencing. I never thought this was a gratuity case. I always thought it was a bribery case. The concept of gratuity never came up. The thought of gratuity never came up. And the word never came up. In terms of the evidence of a quid pro quo, we have the Jordan's own words. I mean, Mark Jordan and two witnesses testified to this said, you know, when asked, well, why are you paying so much attention to the mayor? Why are you giving things of value to the mayor? Well, because I want to get my rezoning through. I'm doing it to get what I want. He didn't say, I'm doing it because I've already gotten what I wanted. Why would he do that? He said to get what he wants. Because he wanted to influence her on her votes. So how do you respond to the appellant's argument that the payment of money or arguably the exchange of any benefits didn't occur until after the first vote? Well, one thing, factually, that's not true, Your Honor. And the benefits, true, there were no monetary benefits before the very first vote. And the very first vote in December 2013 didn't really affect a zoning change. It was just, we agree with this in principle. We're going to go back to the drawing board. I think the very first vote concluded by saying, bring us a plan. Right, right. Which meant that zoning laws nothing of consequence flowed from that. Right. But the key benefit before the first vote was the time and attention and the idea, and he admitted this, Mark Jordan admitted this, well, the only reason I'm flirting with her is to get what I want. So he made those overtures. It's clear from the communications between them that they did have a close relationship between that first vote. It's not simple flirting. They're going on trips to North Park Mall in Dallas on the light rail station in secret, emailing to their personal email accounts. Automatic trip, I must say. But, and that goes on for several months, October, November, December. December 21, shortly after that first vote, she books her trip for Deer Valley in Utah. The same fancy resort that Gwyneth Paltrow was recently about. So that's shortly after that first vote that she's booking a trip to go with a developer, they're both married, for a fancy trip in Utah. So that was the overture, the offer of the thing of value in the language of 666 came on his part before the very first vote for what she valued most. And the case law talks about, well, what is a thing of value? It's subjective. It's what someone attaches to it. And Laura Jordan, the record is clear that she placed a supreme value on the relationship with Mark Jordan and being with him and everything that came along with it. The wealth, the power, the money. She eventually got a well-paying job out of it that she was unqualified for. So he admitted that. And he also told his wife when she found out about the painting that painters were going to paint the mayor's house. I should make one other suggestion to you. Of course, what's going on here is a flip of the burdens in a practical sense. There's no question here, but there is substantial evidence to support a finding that has been found. But the question is whether there's evidence in the record that they could have found alternatively. And that's our focus. There's a lot of evidence that support what happened here. But you see what I'm saying? Right. I understand, Your Honor. The part that Judge Mazzant focused on was the skilling near language that, look, if the jury had been instructed correctly, and basically all that would mean is taking the word reward out of the statute, would the result have been the same? And he found resolutely that the result would have been the same. Based on having sat through two trials for nearly two months, the first trial was in 2019, so he's well versed in the issues and evidence of this case. In terms of Mark Jordan's comment to his wife that we owe her, we owe her a lot, talking about sending the painters to our house to do the renovations. Why would he have owed her if he was just giving her money or things of value for something that she had committed to take or to do anyway? You owe somebody because they had done something for you. The reason he felt that he owed her is because of the campaign switch. But if he felt like he owed her, isn't that more in line with a reward rather than a quid pro quo? I don't think so, Your Honor, because part of it was, I mean, think about it. He found himself in a position that he never intended to be. If it were merely a reward, and she had, just say she had campaigned, yeah, you know, it might be controversial, but I think there should be apartments near the Palisades. And what would be the incentive for him to reward her, if at all, to the degree that he did here? And so there was over $200,000 of benefits. And key to everything here is the relationship. Why would you initiate a relationship with someone who he didn't find physically attractive and cruelly commented that, oh, she's wrinkled, I'm not physically attracted to her? Why would you begin a relationship like that, something that you would be stuck with, and now he's been stuck with this since 2013, if she was going to vote for just a reward? You wouldn't do that. The reason he targeted her was because she was the mayor, she had power and influence, and because of her campaign position. And he knew that he had to get her to switch on that, so yes, the switch of the campaign position is key. In terms of just a case that I think is kind of helpful in terms of understanding how the relationship worked here, it's a Kemp case, we cite it in our brief, it's from the Third Circuit, in that the quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor. And that's kind of how things worked here. Were there agreements between them? Look, if you vote for 800 more new apartments at the Palisades, I'll take you to this resort or take you to this fancy dinner, no. But it was a pattern, and it was all initiated before that very first vote in terms of the relationship, and once that was formed, they each knew that they had to do something for the other. She knew to get him and to pursue that relationship, she had to change her position and vote for rezoning, and he knew that he had to continue offering things of value. He had to continue the relationship or the pretense of it, and as part of that, he would give her things of value, which is exactly what happened. So in terms of the bribery, counsel, your honors, again, Judge Mazzant sat through this trial twice. Twenty-four jurors now have found them guilty twice. If the thing were retried, the parties would put in the same evidence, the result would be the same, and we would ask the court to affirm Judge Mazzant's finding that beyond a reasonable doubt, the verdict would be the same. As for the taxes and the spillover argument, I'm not sure I'm really understanding the argument. And this is Laura's argument. Mark doesn't join. He joined only to the conspiracy counts, which we conceded in the brief, so he didn't join in the substantive counts. But Laura's argument, if she really believed that a gratuity was not taxable, that she didn't have to make her tax forms, she should have asked the judge to give an instruction on that to the jury. But she didn't. And the jury was actually instructed, well, not instructed, there was a stipulation, a joint stipulation by the parties that was read to the jury by the judge. They made clear that income received from illegal activities such as bribes must be reported as income on the recipient's tax return. So the issue of gratuities was not in the stipulation. And the stipulation said that gifts, a person that receives a gift does not have to report the gift to the IRS. And the jury convicted both Jordans on the substantive tax counts. So they necessarily found that whatever Mark Jordan gave to Laura Jordan, they weren't gifts. And Laura  A gratuity is something that's paid to a public official because of a public act that they took. And you most certainly have to report that. It wasn't a gift. The jury found conclusively that it wasn't a gift. And they haven't challenged the sufficiency of that. So what's left? The most likely understanding is that the jury followed the party's stipulation and found that they were bribes. But even if they somehow went beyond that, oh, well, there might be this concept of gratuity here, she still has to report that on her taxes. And that's why we cite the Dobb case in our briefing that makes a distinction between a gift and something that's actually reportable. A gift has to be something given out of a detached and disinterested generosity. And the jury found no gifts. And even if all that is wrong, there's still the count 10 for Laura, where she received a $10,000 commission from Mark Jordan and didn't report that. And that's straight from the Internal Revenue Code, 26 U.S.C. 61 says gross income includes income from things including commissions. And she didn't report that. So, you know, for example, if I get a bonus during a particular year and I don't report that on my taxes, I can't claim, oh, well, I didn't do it because of, oh, Hamilton. IRS would say that has nothing to do with bribery. That's just income to you that you received and you didn't report it. And the same goes for the $5,250 in, quote, legal expense reimbursement that she received. In terms of the willfulness argument that Mark Jordan raises, again, we'd point to the phony invoice that he had his contractor work up for the $24,000 in home renovations where he said, just work it up on one of my commercial buildings. And that came through in his taxes, and he got that deduction. And the irony there is it probably truly was a business expense because in his mind it was bribery to get what he wanted. And so in that sense he was correct. It was just the cost of doing business to get what he wanted. But you can't, of course, deduct bribes. And with that, I see my time is up. Thank you, Your Honors. Thank you, Counsel. Rebuttal. Thank you. The government simply cannot reconcile the evidence with the notion that Laura Jordan was always against apartments. You cannot be pro-Palisades and anti-apartments. Before she knew Mark Jordan, before she ran for mayor, she was in favor of the Palisades project. Architect Larry Good said the Palisades project was not viable unless there were at least 600 apartments. She plainly, publicly was in favor of the project with apartments as long as the apartments were done right. Your argument seems to focus on not whether or not this was a bribe versus a reward. I think your argument focuses on that this was not even if only a quid pro quo was given to the jury that there was no bribery at all. It does focus on whether it was a quid pro quo or a reward. It was reward if he was anticipating she was going to vote for him. Then he's not trying to influence her vote. He's already got his vote. Plainly, if he's giving her a benefit, it is to reward her for that vote as opposed to influence her for that vote. That's the difference between a gratuity and a quid pro quo. While the word gratuity was never mentioned, this is where Judge Bazant went wrong, the word reward untethered to a quid pro quo, which is the equivalent of gratuity, was mentioned and mentioned frequently. The government case agent conceded that there was no evidence of a quid pro quo. He testified, and this is in the record at 12-863, the question was, during a review of hundreds of emails and texts, there's no if you do this, I'll do that. There is nothing referenced in any way that includes things of value for votes. Agree with me? The answer is yes. As the Supreme Court said in Nader, it is not this Court's function to weigh the evidence for innocence. It's not even whether there was sufficient evidence. It's not what this Court would have done if this Court was the fact finder. A review in court does not become, in effect, a second jury to determine whether the defendant is guilty, but rather whether the record contains evidence that could rationally lead to a contrary finding. Here, the evidence plainly has evidence that can rationally lead to a contrary finding. The jury plainly could have seen this as a reward for an official action that Laura Jordan was going to take, had determined to take, and did take, as opposed to him trying to influence her vote, to buy a vote, to get her to change her position. Any number of courts have recognized that very distinction. Hawkins, the Seventh Circuit says, accepting a reward for doing something the official would have done anyway does not violate the bribery statute. United States v. Wright, Third Circuit case. For bribery, the jury, quote, must conclude that the payer provided a benefit to the public official, intending that he will thereby take favorable official acts that he would not otherwise take. And in your Scioli, U-R-C-I-U-O-L-I, the First Circuit approved an instruction to the jury that the jury must find that the payer, quote, intended the payment to cause the official to alter his official acts to change an official position he would otherwise have taken, or to take official actions that he would not have taken but for the payments. Your time has expired. Thank you, Your Honor. Because there's evidence here that he did not attempt to influence her vote, it should be reversed. Thank you, Your Honor. All right. I would like to answer a question that came up to the government and then talk about the tax counts. When there is conflicting evidence, as there is here, and these two have the current political debate, they're like on a different planet because we're citing all the evidence that it was a reward, and they're citing all the evidence that it was a quid pro quo. With the conflicting evidence, there has to be a reversal. And Judge Higginbotham, the government fought against requiring a quid pro quo at this trial. The defense requested  defeated that request. And obviously, in argument, the defense couldn't argue it was only a reward because that would have convicted them on the wrong instruction that was given. Here's the problem with the taxes. And Judge Mazant's order granting bond explains this. The judge instructed the jury that illegal payments like bribes, illegal bribes, are income. That's correct. Illegal bribes under 666 are income. That's correct. But with the rest of the jury instructions, he told the jury that a reward without a quid pro quo and without any expectation of future voting or future works, a reward alone is an illegal bribe under 666, therefore income. And so the same problem infects the tax counts. The jury was told if this was a reward, it's taxable income, but that's wrong. There was no evidence at trial about whether a reward is taxable or not. The only thing that the IRS agent testified to is that illegal bribes are income. So those counts have to be reversed and there's certainly also conflict in the evidence about this $10,000 as well. If there aren't any other questions, thank you very much. Thank you.